### A92A1202. DANIELL et al. v. CLEIN et al.
(425 SE2d 344)

McMurray, Presiding Judge.

Warren Clein and Harold Clein, co-executors of the estate of Harry Clein, brought suit against Carolyn Daniell and Robert Daniell in the Superior Court of DeKalb County. In their complaint, plaintiffs alleged that Ms. Daniell was employed by Harry Clein on a part-time basis to assist him in his jewelry business; that Harry Clein paid Ms. Daniell $2,000 per month for her services; that Harry Clein opened a joint account at the First National Bank of Atlanta in which he designated Ms. Daniell as a joint owner for his convenience; and that Harry Clein owned a safety-deposit box at the bank and listed Ms. Daniell on the access designation card for his convenience. Plaintiffs also alleged that after Harry Clein died, on March 26, 1990, at 85 years of age, Ms. Daniell offered to assist plaintiffs with respect to Harry Clein's jewelry business; that plaintiffs accepted Ms. Daniell's offer of assistance and agreed to compensate her for her services; that, between March 27 and April 2, 1990, Ms. Daniell prepared, signed and delivered checks drawn on the joint account at the bank to pay for nursing services rendered to Harry Clein's 83-year-old widow, Esther Clein; that, on April 2, 1990, Ms. Daniell stated that she would no longer write checks on the joint account; that, thereafter, without notifying plaintiffs, Ms. Daniell withdrew the entire balance — $82,290.28 — from the joint account and claimed she was entitled to the contents of the safety-deposit box. Plaintiffs sought, inter alia, damages in the amount of $82,290.28, punitive damages, attorney fees, and a declaration as to which party was entitled to the contents of the safety-deposit box. Defendants answered the complaint, denying any liability to plaintiffs. In addition, Ms. Daniell counterclaimed, seeking compensation for services rendered to Harry Clein in March 1990 and a declaration that she was entitled to Harry Clein's jewelry business.

With regard to the jewelry business claim, Ms. Daniell alleged that Harry Clein orally agreed to leave the business to her when he died if she would continue to learn about the jewelry business and work with him; and that, pursuant to that agreement, she continued to work with Harry Clein until he died. Plaintiffs moved for partial

summary judgment upon Ms. Daniell's claim that she was entitled to the jewelry business and, following a hearing, their motion was granted. Thereafter, the case proceeded to trial.

We summarize the evidence adduced at trial as follows: Harry Clein came to the United States as a young man, settled in Atlanta, and started a jewelry business; his wife, Esther Clein, helped him in the business. Clein handled the creative, craftsman side of the business; Esther took care of the books and other business matters.

In their later years, the Cleins lived in a condominium building on Peachtree Street. The business was located in Room 305 of the same building. Clein was very devoted to his wife and, when her health failed, he employed nurses to care for her in the home around the clock. The cost of that care was considerable (between $8,000 and $9,000 per month). One of Harry Clein's employees characterized his devotion to his wife this way: "He loved Esther. She was number one in his life. She came first above all else."

Harry Clein did business with Carolyn Daniell's family from the time that Ms. Daniell was a child. Over the years, Clein came to know Ms. Daniell and her family on a personal level; he attended Ms. Daniell's wedding and other family functions. In 1985, when Esther Clein's health began to decline and she could no longer help with the jewelry business, Clein asked Ms. Daniell if she would work for him on a part-time basis. Ms. Daniell agreed to do so. She worked approximately 25 hours a week for a beginning monthly salary of $500. Ms. Daniell soon learned the ins and outs of the jewelry business and, over time, Clein increased her monthly salary to $2,000.

Clein's relationship with Ms. Daniell and her family was "close." Clein's sons, Warren and Harold, had no interest in running their father's jewelry business and Clein sometimes expressed the hope that Ms. Daniell would continue the business after he was gone.

Ms. Daniell was more than an employee. From time to time, she looked in on Esther Clein; and she and her husband performed many personal favors for the Cleins. Clein came to know Ms. Daniell's children. He played with them when they came for visits and took them for walks.

On occasion, Clein referred to Ms. Daniell as his "daughter" and her children as his "grandchildren." Over the years, Clein made gifts of jewelry to Ms. Daniell and her family. Clein was a warm, loving man; he referred to other friends or employees as his children and he gave gifts of jewelry to other people that he was fond of.

On August 11, 1989, Clein, accompanied by Ms. Daniell, went to the Buckhead Branch of the First National Bank of Atlanta (hereinafter referred to as the "bank") and opened safety-deposit box no. 107. The box was owned by Clein. However, Ms. Daniell's name was placed on the access designation card as a "person deputized." Ac-

cording to Ms. Daniell, Clein said that he was opening the box for her and that, from time to time, he would put things in the box for her and her children.

Ms. Daniell did not look in the box until Clein died and she did not know what it contained. An inventory taken after Clein's death established that the box contained items that belonged to one of Clein's customers as well as what Clein would have called "findings," i.e., gold, silver, odds and ends that Clein used to make jewelry. The estimated value of the "findings" was between $5,000 and $10,000.

On November 8, 1989, Clein went to the bank with Ms. Daniell and opened a joint money market checking account. The signature card signed by Clein and Ms. Daniell provided that the depositors agreed to the terms and conditions set forth in the rules and regulations of the bank. In part, the rules and regulations of the bank provided that upon the death of a joint depositor, the sums on deposit belonged to the surviving depositor to the exclusion of the decedent's estate or heirs.

According to Wanda Jones, the bank officer who opened the account, Clein said he wanted to put Ms. Daniell's name on the account so she could conduct his banking for him. Jones had previously opened joint accounts for employers and their employees and she did not give Clein the option of using a power of attorney on an individual account. Jones did not discuss the survivorship feature of the account with Clein.

Clein told Jones he did not want Ms. Daniell's name on the statement or the checks. Because of the way the bank's computers were set up, Jones was required to place Ms. Daniell's name on the statement. However, Jones was able to accommodate Clein with regard to the checks — they were to bear the name "Harry Clein Diamonds."

The joint account was opened with money from the Cleins' personal funds totaling $104,439.60. The balance in the account fluctuated between $82,000 and $115,000. It was an interest bearing account and bore Clein's social security number. Clein paid the taxes that accrued on the interest.

Clein deposited funds from the jewelry business into the joint account until it was time to pay the business's bills. Then Clein transferred money from the joint account to a business account that did not bear interest.

The business account was also at the Buckhead Branch of the First National Bank of Atlanta. That account bore the name "Harry Clein Jeweler." On November 8, 1989, the same day he opened the joint account, Clein added Ms. Daniell's name to the business account as a signatory so she could write checks on his behalf.

One day, Flake Jokel, one of Esther Clein's nurses, noticed the joint account statement and asked Clein why Ms. Daniell's name ap-

peared on the account. Clein replied: "I did that in case there was an emergency, or in case I have an illness, or if there was, for some reason, I just didn't feel like writing checks . . . then Carolyn could do it."

Ms. Daniell testified that Clein told her the money he placed in the joint account was hers and she could use it whenever she wanted to. She also testified, however, that the money in the joint account was a gift, contingent on the death of Clein. Ms. Daniell did not use the money in the joint account during Clein's life. On the contrary, the money was used by Clein to pay personal and business expenses.

At the time the joint account was opened, the Cleins had net assets of more than $700,000. Ms. Daniell and her husband were worth approximately $500,000.

Clein died on March 26, 1990. In his will, Clein left his entire estate to his wife, Esther. His sons, Warren and Harold, were named co-executors of his estate.

After his father died, Warren asked Ms. Daniell to continue working and to help him straighten out Clein's personal and business affairs and she agreed to do so. To that end, Ms. Daniell wrote checks on the joint account to pay Esther Clein's nurses. Moreover, at Warren's direction, Ms. Daniell wrote herself a check on the business account to pay her salary for the month of March.

Shortly after Clein's death, Ms. Daniell found a note, in Clein's apartment, which had been written and signed by Clein. It read, in part: "3-20-90 Juliana - Jessica - Robert Jordan and Carolyn Daniell Room 305 Esther Warren & Harold The above room & findings my wish . . . she is a very fine lady. . . ."

On April 2, 1990, Ms. Daniell told Warren that she was not going to write any more checks on the joint account. The next day, without telling Warren or Harold, Ms. Daniell went to the bank and withdrew all but $1 from the joint account and all but $1 from the business account. (Because she removed the money from the business account, Ms. Daniell did not present the $2,000 March salary check for payment.) She called Warren on April 5 and told him what she had done.

The bank prevailed upon Ms. Daniell to return the money that she removed from the business account; and the plaintiffs promptly closed that account. However, Ms. Daniell refused to return the money that she removed from the joint account, claiming that she was entitled to that money, the jewelry business, and the contents of the safety-deposit box. Thereafter, Warren and Harold Clein, as co-executors of the estate, brought this suit.

At the conclusion of the trial, the jury rendered a verdict finding that the proceeds of the joint bank account and the contents of the safety-deposit box belonged to the plaintiffs, as co-executors of the estate of Harry Clein; that plaintiffs were entitled to recover attorney

fees in the amount of $5,000 and punitive damages in the amount of $1,000; and that Ms. Daniell was entitled to her salary ($2,000) for the month of March 1990. The trial court determined that plaintiffs failed to introduce sufficient evidence to support an award of attorney fees and it granted defendants' motion for directed verdict (the trial court having previously reserved its ruling on the motion) on the attorney fees issue. Otherwise, the trial court entered judgment in accordance with the jury's verdict. Defendants appeal, enumerating error upon the general grounds the failure of the trial court to grant their motion for a directed verdict with regard to the proceeds of the joint account and the contents of the safety-deposit box, the court's instructions to the jury, the award of punitive damages, and the grant of plaintiffs' motion for summary judgment upon Ms. Daniell's claim that she was entitled to the jewelry business. *Held*:

1. *The Joint Account.* "A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent." OCGA § 7-1-812 (a). "Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent, unless there is clear and convincing evidence of a different intention at the time the account is created." OCGA § 7-1-813 (a). Whether the evidence is sufficient to establish a "different intent" (OCGA § 7-1-812 (a)) or a "different intention" (OCGA § 7-1-813 (a)) with regard to a joint account is, ordinarily, a question to be decided by the trier of fact. See *Godwin v. Johnson*, 197 Ga. App. 829, 831 (399 SE2d 581).

In our view, the evidence provided clear and convincing support for the jury's determination that Clein added Ms. Daniell's name to the joint account "for convenience rather than to effect a gift of the funds to her. Accord *James v. Elder*, 186 Ga. App. 810 (368 SE2d 570) (1988); *Georgia Savings &c. Co. v. Sims*, 332 FSupp. 1306 (N.D. Ga. 1971)." *Turner v. Mikell*, 195 Ga. App. 766, 767 (395 SE2d 20). Considering the evidence in its entirety, the jury was fully authorized to find that Clein did not intend for the sums in the joint account to belong to Ms. Daniell either before or after he died.

Defendants contend they were entitled to a directed verdict with regard to the joint account because the rules and regulations of the bank expressly provided that upon the death of a joint depositor the sums remaining on deposit would belong to the surviving party. They also contend the trial court erred in failing to charge the jury that under the rules and regulations of the bank, the sums remaining in the joint account belonged to Ms. Daniell to the exclusion of Clein's estate. We disagree.

The rules and regulations of the bank constituted evidence of

Clein's intention with respect to the sums on deposit at the time of his death, nothing more. The rules and regulations cannot be said to have precluded plaintiffs from demonstrating, by clear and convincing evidence, that Clein had no intention of giving Ms. Daniell the money in the joint account. OCGA § 7-1-813 (a). See *White v. White*, 253 Ga. 267, 268, 269 (319 SE2d 447), in which funds in joint savings account with right of survivorship were deemed subject to equitable division in spite of contract between parties and savings and loan association. See generally *Turner v. Mikell*, 195 Ga. App. 766, supra, in which certificates of deposit contained printed language specifying that in the event of the death of one of the depositors, the proceeds would be paid to the survivor.[1] We note, in passing, that the trial court properly charged the jury that it could consider the documents signed at the time the account was opened as evidence of Clein's intention with regard to the money in the joint account.

Defendants assert the trial court erred in charging the jury that the designation of an account by a depositor as a joint account with right of survivorship was not conclusive as to the depositor's intent and that no transfer of ownership would be deemed to have taken place if the depositor's actual intent was to provide for his own convenience "rather than to make a present gift." See *James v. Elder*, 186 Ga. App. 810, 811 (368 SE2d 570). In this regard, defendants argue that the words "rather than to make a present gift" did not comport with the evidence and led the jury astray because defendants took the position that Clein intended for Ms. Daniell to have the money in the joint account upon his death, not when he opened the account.

Although Ms. Daniell testified that Clein intended for her to have the money in the account after he died, she also testified that he intended for her to have the money in the account from the moment the account was opened. Thus, the court's charge comports with that version of the evidence. Moreover, the trial court charged the language of OCGA § 7-1-813 (a) which simply refers to the joint depositor's intent at the time the account was opened. We find no error in the trial court's charge. Taken as a whole, it did not improperly stress plaintiffs' version of the facts. See *Christian v. Smith*, 78 Ga. App. 603, 607-609 (51 SE2d 857). If defendants wished an elaboration of the charge, they should have presented a request in writing. *Progressive Life Ins. Co. v. Archer*, 73 Ga. App. 639, 645 (6), 647 (37 SE2d 713).

---

[1] This is not to say that a bank cannot rely on such rules and regulations in paying the sums on deposit in a joint account to a surviving depositor. OCGA § 7-1-813 (a) governs the relationship between joint depositors; it does not govern the relationship between a bank and its joint depositors. After all, a bank cannot be expected to know its joint depositors' intentions with regard to the sums on deposit in a joint account. See generally OCGA § 7-1-820.

2. *The Safety-Deposit Box.* " 'To constitute a valid inter vivos gift, . . . (1) (t)he donor must intend to give the gift; (2) (t)he donee must accept the gift; and (3) (t)he gift must be delivered or some act which under law is accepted as a substitute for delivery must be done.' OCGA § 44-5-80. The party seeking to prove title by gift must do so by clear and convincing evidence. *McGrew v. Cooper,* 110 Ga. App. 347, 350 (3) (138 SE2d 453) (1964)." *Parker v. Peavey,* 198 Ga. App. 694, 696 (2) (403 SE2d 213).

" 'A delivery of property subject to be reclaimed by the donor at any time prior to his death, or where full control or power over the property or fund vests in the donee only after the death of the donor, does not constitute a valid gift inter vivos.' 20 Cyc. 1211, § 2. . . . 'To make a valid gift, there must be a present intention to give, and a complete renunciation of right, by the giver, over the thing given, without power of revocation, and a full delivery of possession as a gift, inter vivos.' *Mims v. Ross,* 42 Ga. 121 (2)." *Drake v. Wayne,* 52 Ga. App. 654, 659, 660 (184 SE 339).

"Actual manual delivery is not essential to the validity of a gift. Any act which indicates a renunciation of dominion by the donor and the transfer of dominion to the donee shall constitute a constructive delivery." OCGA § 44-5-82. Whether the donor completely relinquished control of the gift is a question of fact to be resolved by the jury. *Williams v. McElroy,* 35 Ga. App. 420, 421 (133 SE 297).

Given the facts of this case, the jury was authorized to conclude that Clein did not make an inter vivos gift to Ms. Daniell of the contents of the safety-deposit box. Why? Because Clein retained control of the box. The most that can be said for Ms. Daniell is that she shared control of the box. Ms. Daniell never looked in the box and did not know what was in it. Clein could have removed any of the contents in the box at any time. It cannot be said, therefore, that Clein completely relinquished control of the items he placed in the box. See *Clark v. Bridges,* 163 Ga. 542, 544-546 (136 SE 444); *Williams v. McElroy,* 35 Ga. App. 420, supra.

3. *Punitive Damages.* A breach of fiduciary duties is sufficient to support an award of punitive damages. *Caswell v. Jordan,* 184 Ga. App. 755, 760 (7) (362 SE2d 769). Whether punitive damages should be awarded for a breach of fiduciary duties is ordinarily a question for the jury; the question on appeal is whether there was any evidence to support the jury's award. *Caswell v. Jordan,* supra.

In the case sub judice, the evidence was sufficient to support the jury's $1,000 punitive damages award. There was evidence enabling the jury to find that Ms. Daniell owed a fiduciary duty to the estate of Harry Clein and that she breached that duty when she removed the funds in the joint account and the business account for purposes of her own.

*4. Partial Summary Judgment.* In their final enumeration of error, defendants contend the trial court erred in granting plaintiffs' motion for summary judgment with regard to defendants' claim to the jewelry business. In this regard, defendants argue that a question of fact exists as to whether Clein orally agreed to leave Ms. Daniell the business when he died.

At the outset, we point out that while defendants were permitted to appeal directly from the order granting plaintiffs' partial summary judgment motion pursuant to OCGA § 9-11-56 (h), they were not required to do so. Defendants were entitled to wait until the entry of final judgment to appeal from the partial summary judgment ruling. See *Gulf Oil Co. v. Mantegna*, 167 Ga. App. 844, 845 (1) (307 SE2d 732). Cf. *Jarallah v. Aetna Cas. &c. Co.*, 199 Ga. App. 592 (405 SE2d 510). It follows that we have jurisdiction to consider defendants' final enumeration of error.

In opposition to plaintiffs' partial summary judgment motion, Ms. Daniell submitted an affidavit in which she deposed that several years prior to his death, Clein agreed that if Ms. Daniell continued to work with him and learn the diamond business, he would leave the business to her at his death; and that pursuant to that agreement she continued to work with Clein and learn the business until he died. Relying upon her affidavit, Ms. Daniell argues that the jury should have been permitted to consider whether she was entitled to the jewelry business.

In *Cagle v. Justus*, 196 Ga. 826 (28 SE2d 255), the Supreme Court reiterated the following legal principle: "Where a party for a valuable consideration enters into a contract whereby he obligates himself to make a will, a failure during his lifetime to make the will according to the contract gives a right of action to enforce the terms of the contract against his estate." Plaintiffs have no quarrel with this rule of law. They simply take the position that if Clein made such an agreement, it was not enforceable because it did not satisfy the Statute of Frauds. We agree.

Because the alleged agreement was not to be performed within one year of its making, it had to be in writing and signed by Clein. OCGA § 13-5-30 (5); *Alkaril Chemicals v. O'Lenick*, 202 Ga. App. 230, 231 (414 SE2d 257). Of course, partial performance can take an oral agreement out from under the Statute of Frauds. OCGA § 13-5-31 (3). "The part performance required by [the Code], however, must be essential to the contract, that is, required by its terms, such that a benefit is conferred upon the employer, with a consequent loss to the employee which renders the court's refusal to enforce the contract tantamount to a fraud upon the employee. [Cits.] Thus, the part performance shown must be consistent with the presence of a contract and inconsistent with the lack of a contract." *Hudson v. Venture In-*

*dus.*, 243 Ga. 116, 118 (252 SE2d 606).

In the case sub judice, Ms. Daniell's performance was not consistent with the presence of the agreement and inconsistent with the lack of the agreement. Ms. Daniell worked for Clein for several years and was paid handsomely for her work. The law is clear that an employee cannot claim part performance simply because she entered upon employment and served. *Slater v. Jackson*, 163 Ga. App. 342 (2) (294 SE2d 557); *Utica Tool Co. v. Mitchell*, 135 Ga. App. 635, 637 (218 SE2d 650). The trial court did not err in granting plaintiffs' motion for partial summary judgment.

*Judgment affirmed. Sognier, C. J., and Cooper, J., concur.*

DECIDED NOVEMBER 5, 1992 —
RECONSIDERATION DENIED NOVEMBER 20, 1992 

*James E. Spence, Jr.*, for appellants.
*James T. Perry, Kenneth H. Schatten*, for appellees.